# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMES LAWTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 CV 00297 |
| v. ) | |
| ) | Judge Jorge L. Alonso |
| WEIL FOOT & ANKLE ) | |
| INSTITUTE, LLC and SWEDISH ) | |
| COVENANT HOSPITAL, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Swedish Covenant Hospital seeks summary judgment in its favor on plaintiff's claim that he was wrongfully discharged in retaliation for complaining of discrimination prohibited by the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*. For the reasons set forth below, the motion is denied.

## BACKGROUND

The following is the relevant factual background, viewing the facts in the light most favorable to plaintiff (as the Court must at this stage). *See Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014) ("We do not necessarily vouch for the objective accuracy of all factual statements here, but defendants moved for summary judgment, which requires that we view the evidence in this harsh light."). In 2014, plaintiff, Dr. James Lawton, became a co-director of the podiatric residency program at Swedish Covenant Hospital ("SCH"). At that time, he was also employed by Weil Foot & Ankle Institute, LLC, ("WFAI") as a practicing podiatric physician and surgeon. In 2015, plaintiff suffered from a painful and debilitating medical condition, a ruptured disc in his neck, which required surgery. He sought certain accommodations from WFAI,

including time off, but WFAI did not accommodate him. On May 4, 2015, WFAI terminated plaintiff. Plaintiff filed an EEOC charge against WFAI, claiming that his discharge was the product of discrimination on the basis of disability, in violation of the ADA. In January 2017, after receiving his right-to-sue letter from the EEOC, plaintiff filed this lawsuit against WFAI.

Meanwhile, plaintiff continued working as co-director of the podiatric residency program at SCH, and Dr. Derek Kelly, then the Chief Medical Officer at SCH, was satisfied with his job performance. (Def.'s LR 56.1 Resp. ¶ 9, ECF No. 150.) However, plaintiff's relationship with the other co-director, Dr. Gregory Amarantos, who "owns an interest" in WFAI (Pl.'s LR 56.1 Resp. ¶ 10, ECF No. 145), became tense. Dr. Amarantos told Dr. Kelly that plaintiff had sued his practice. (Def.'s LR 56.1 Resp. ¶ 21.)

In February 2017, plaintiff and Dr. Amarantos met with Dr. Bruce McNulty, who had recently replaced Dr. Kelly as SCH's Chief Medical Officer, and Dr. Eric Gluck, SCH's Chief Academic Officer. During this meeting, Dr. Amarantos stated that he was upset over the lawsuit and its financial cost to his practice. According to plaintiff, Dr. Amarantos screamed out that plaintiff was suing him in federal court and he "wants something fucking done about it." (*Id.* ¶ 23.)

Plaintiff felt that Dr. Amarantos became increasingly hostile toward him from that point forward. In the spring of 2017, plaintiff and Dr. Amarantos were unable to cooperate in creating the rotational schedule for the 2017-2018 academic year, instead creating alternative versions of the schedule. (Pl.'s LR 56.1 Resp. ¶ 29.) Dr. McNulty became frustrated by what he perceived to be the co-directors' inability to communicate and collaborate effectively. (*Id.*; *see id.* ¶ 32; Def.'s LR 56.1 Stmt., Ex. D, McNulty Dep. at 62:14-63:1, 119:19-22, ECF No. 121-4.)

In late July 2017, Dr. McNulty told plaintiff that he was preparing to "interview[] other people to be director or co-directors of" the podiatric residency program, having been told that

plaintiff was uncooperative. (*Id.* ¶ 27; *see* Pl.'s LR 56.1 Resp. ¶¶ 28, 33.) As he explained at his deposition, Dr. McNulty had become concerned about the "lack of ability of the two program directors to communicate in a way that allowed the program to be functional," so "a decision needed to be made to do something." (Pl.'s LR 56.1 Resp. ¶ 32.)

In August 2017, Dr. McNulty conveyed some feedback to plaintiff from some of the residents he supervised, hoping it would be "valuable for him" as he continued to work with residents. (Pl.'s LR 56.1 Resp. ¶ 35.) Dr. McNulty recalls that plaintiff seemed "accepting" of the feedback at the time. (McNulty Dep. at 49:5.) However, two of the residents who had offered feedback complained that, following this conversation with Dr. McNulty, plaintiff angrily confronted them about it; one reported that plaintiff had punched a wall during the encounter. (Pl.'s LR 56.1 Resp.. ¶¶ 37-38.) According to plaintiff, Dr. McNulty told plaintiff of these residents' complaints but did not tell him the details, and, having seen those details in the course of this litigation, plaintiff disputes many of them, asserting that his conversations with the residents were civil, his demeanor was not angry or threatening, and he did not punch a wall. (Defs.' LR 56.1 Resp. ¶ 33, *see id.* ¶¶ 28-30.)[1] Dr. McNulty testified at his deposition that, after the residents complained about the angry confrontations, he called plaintiff for an explanation, and he does not remember what plaintiff said in response, although he does remember that he was already considering terminating plaintiff at that time. (McNulty Dep. at 55:15-56:11).

On September 1, 2017, SCH terminated plaintiff. Dr. McNulty testified that it was "essentially" his decision, which he made because of the ongoing communication problems between plaintiff and Dr. Amarantos combined with what he saw as plaintiff's inappropriately angry confrontation with the complaining residents. (Pl.'s LR 56.1 Resp.. ¶ 42.) He testified that

---

[1] Defendant purports to dispute that Dr. McNulty refused to tell plaintiff the details of the written complaint, although it does not cite contrary evidence. (*Id.* ¶ 33.)

3

for "several months" he had known that "one or both" of Dr. Amarantos and plaintiff "needed to go" for the residency program to have effective leadership, but he was not specifically considering terminating plaintiff until he learned of the angry confrontations with the complaining residents in August 2017. (*Id.* (citing McNulty Dep. at 112:2-15); *see also* McNulty Dep. at 49-56, 63:2-6.) According to plaintiff, Dr. McNulty told him, "you made up my mind for me," although Dr. McNulty had never really listened to plaintiff's "side of the story." (Pl.'s Ex. 8, Lawton Dep. at 417:18-418:8, ECF No. 145-8.)

Following his termination from SCH, plaintiff filed an EEOC charge against SCH. After receiving a right-to-sue letter, plaintiff amended his complaint in this case to assert an ADA retaliation claim against defendant. On April 15, 2020, plaintiff stipulated to dismiss his claims against WFAI pursuant to a settlement (*see* Stipulation of Dismissal, ECF No. 118), leaving his retaliation claim against SCH as the only remaining claim in this suit.

## DISCUSSION

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would

reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

The ADA provides, as a "general rule," that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The statute defines the term "discriminate against a qualified individual on the basis of disability" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee" or "denying employment opportunities" to employees who need such accommodations. *Id.* § 12112(b)(5)(A-B). The ADA's retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203. "In order to prove a claim of retaliation, the employee must show: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two." *Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 701 (7th Cir. 2015). "[T]he appropriate question on summary judgment is simply: could a reasonable jury find based on *all* available evidence that a . . . retaliatory motive caused [plaintiff's] termination?" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 569 (7th Cir. 2017); *cf. Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016) ("[T]he sole question that matters [is] [w]hether a reasonable juror could conclude that [plaintiff] would have kept his job if he had [not complained of disability discrimination] and everything else had remained the same.");

*see also Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (noting that courts generally evaluate claims of retaliation the same way under various different statutes prohibiting employment discrimination, including the ADA and Title VII)..

Defendant argues that it is entitled to summary judgment because plaintiff has not produced evidence establishing a causal connection between the protected activity (his lawsuit against WFAI) and the adverse action (his termination from SCH). According to defendant, while the lawsuit may have caused tension between plaintiff and his co-director, Dr. Amarantos, there is no evidence that it played any role in SCH's decision to terminate plaintiff. It was Dr. McNulty who made that decision, and, defendant argues, the decision was based on two factors: (1) the ineffective leadership of the podiatric residency program that Dr. McNulty believed plaintiff and Dr. Amarantos were providing, and (2) plaintiff's angry confrontation of the two residents who had provided feedback to Dr. McNulty about plaintiff's performance as director. This lawsuit, defendant argues, was not a factor in the decision.

In the end, the jury might well agree with defendant, but the Court cannot say that no reasonable juror could find otherwise. Considering plaintiff's termination in its full factual context and viewing the evidence from plaintiff's point of view, a reasonable juror could conclude that plaintiff would have kept his job if he had never filed this lawsuit to complain that WFAI discriminated against him based on his disability.

The Seventh Circuit has recognized that evidence of a pretextual reason for a termination decision, in combination with evidence of suspicious timing, can together create a genuine issue of fact. *See Coleman v. Donahoe*, 667 F.3d 835, 860-62 (7th Cir. 2012); *see also Haworth v. Round Lake Area Sch., Cmty. Unit Sch. Dist. 116*, No. 17 C 7038, 2019 WL 3080928, at *6-8 (N.D. Ill. July 15, 2019). To demonstrate that an employer's given reason for an adverse

6

employment action was a pretext for an unlawful motive, an employee must demonstrate not just "faulty reasoning or mistaken judgment on the part of the employer," but that the employer's reason is a "lie, specifically a phony reason" for the adverse employment action. *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotations marks omitted). The employee may make the requisite showing by, for example, pointing to evidence that the proffered reason is "factually baseless" or "insufficient to motivate" the employer's action. *Id.* (internal quotations marks omitted). When an employer fails to follow its own procedures in taking an adverse employment action and faults the employee based on "subjective criteria," particularly when the employee is experienced and well-qualified, it leaves itself vulnerable to a factfinder's inference that its given reason for the decision was a pretext for an unlawful motive. *See Guinto v. Exelon Generation Co., LLC*, 341 F. App'x 240, 246 (7th Cir. 2009) (citing *Rudin v. Lincoln Land Cmty. Coll.,* 420 F.3d 712, 727 (7th Cir.2005), *Giacoletto v. Amax Zinc Co.,* 954 F.2d 424, 427-28 (7th Cir.1992), and *Bell v. EPA,* 232 F.3d 546, 551-52 (7th Cir.2000)).

Whether the timing of the adverse action lends support to the inference of causation "depends on context, just as an evaluation of context is essential to determine whether an employer's explanation [for an adverse employment action] is fishy enough to support an inference that the real reason must be discriminatory." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). Because the issue depends on context, there is no "bright-line numeric rule," *Coleman*, 667 F.3d at 861, providing that, after a certain length of time, an adverse action is too far removed from the protected activity for the mere "order of events" to suggest a "causal link," *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998). In cases where no other evidence suggests a causal nexus, a few months (or indeed much less) may be too long, *see, e.g., Davidson*, 133 F.3d at 511; *cf. Loudermilk*, 636 F.3d at 315. On the other hand, when there is

7

"corroborating evidence of retaliatory motive," an "interval" of "months" may not be too long to defeat the inference of causation, *see Coleman*, 667 F.3d at 861; *Malin v. Hospira, Inc.*, 762 F.3d 552, 559 (7th Cir. 2014) (explaining that the "mere passage of time is not legally conclusive proof against retaliation" (internal quotation marks omitted) and citing cases stating that an inference of causation is permissible even if a period of one or two years separates the protected activity from the adverse action). The district court "may not view recency alone as the decisive factor," if the surrounding circumstances leading up to the protected activity or events transpiring during the interim between the protected activity and the adverse action suggest an unlawful motive. *See Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528–29 (7th Cir. 2008) (supervisor's anti-Muslim comments on September 11, 2001, were not too remote to support causation of Muslim employee's termination over a year later, where the employee was purportedly terminated for reduced output and deteriorating performance, although he had received positive performance reviews and found plenty of work prior to September 11, and his department as a whole did not lack work afterward).

The Seventh Circuit has stated (in *dicta*) that an employment discrimination plaintiff may be able demonstrate a triable issue of material fact by adducing evidence that his "former employer waited in the weeds for five or ten years and then retaliated" against him for protected activity. *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n.6 (7th Cir. 1996). Several judges have relied on these *dicta* to conclude that, where the evidence suggests that the employer lay in wait for an employee who had made protected complaints of discrimination, firing him as soon as a plausible pretext presented itself, the employee has a triable retaliation claim. *See Eversole v. Spurlino Materials of Indianapolis, LLC*, 804 F. Supp. 2d 922, 935 (S.D. Ind. 2011) ("[I]t is not difficult to imagine that [the employer] patiently waited in the weeds to retaliate against [the plaintiff], and that [the plaintiff's accident, two years after plaintiff filed an employment discrimination suit,]

8

gave it the opportunity to strike while the iron was hot."); *Bowers v. Radiological Soc. of N. Am., Inc.*, 101 F. Supp. 2d 691, 696 (N.D. Ill. 2000) (denying summary judgment because, where the plaintiff was fired based on an "evaluation" provided by a "harassing supervisor with a sexual grudge," a "rational jury might believe" that the supervisor had "waited until an opportunity presented itself to bushwack [*sic*]" the plaintiff); *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 641 (7th Cir. 2020) (Hamilton, J., dissenting) (concluding that summary judgment should have been denied, even though the adverse action came two years after the protected activity, because the employer's "managers retaliated against [the plaintiff] at their very first opportunity to do so"); *see also McGuire v. City of Springfield, Ill.*, 280 F.3d 794, 796 (7th Cir. 2002) (ten-year gap between protected activity and termination did not necessarily preclude an inference of causation when, under the circumstances of the case, the termination came when a convenient, "early opportunity" presented itself); *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929-30 (7th Cir. 2020) ("Employers long ago 'taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written.'") (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).

  Turning to the facts of this case, while there is some evidence that plaintiff and Dr. Amarantos had certain disagreements over the direction of the residency program prior to 2017, there is also evidence that, until plaintiff filed this lawsuit, they generally "got along," and they could resolve for themselves any disputes that arose between them to keep the program running smoothly (Pl.'s LR 56.1 Resp. ¶¶ 13-14). According to plaintiff, after plaintiff filed this lawsuit, Dr. Amarantos angrily shouted in a meeting with their superiors that he "want[ed] something fucking done about it," and Dr. Amarantos was increasingly hostile thereafter. A reasonable juror could find that the increasing hostility impeded the smooth direction of the residency program,

which caused Dr. McNulty to become frustrated with plaintiff and Dr. Amarantos, and to feel that "one or both" of them "needed to go." (McNulty Dep. at 112:2-15.) Dr. McNulty testified that he decided to terminate plaintiff after hearing that he had angrily confronted the residents who had provided feedback about his direction of the program; but plaintiff denies that he behaved in an angry or threatening manner with these residents, and he says that upon terminating him, Dr. McNulty told him, "you made up my mind for me," although Dr. McNulty had never really listened to plaintiff's "side of the story." (Pl.'s Ex. 8, Lawton Dep. at 417:18-418:8.) Both Dr. Gluck and Dr. Kelly suggested that, in effecting plaintiff's termination so hastily, without any sort of hearing or fuller investigation into the incident or incidents that precipitated it, SCH departed from its normal practices. (Def.'s LR 56.1 Resp. ¶¶ 38, 40.)

Based on that evidence, a reasonable juror could conclude that plaintiff and Dr. Amarantos's problems getting along did not predate the filing of this suit and instead stemmed from it. Further, a reasonable juror could find that Dr. Amarantos, if he did not outright ask for plaintiff to be fired, put SCH in a him-or-me situation by refusing to collaborate or cooperate with him in directing the residency program, until, fed up, SCH seized on a pretext for terminating plaintiff that happened to present itself. The asserted reason for terminating plaintiff—the August 2017 confrontations with the residents who had given feedback about him—was sufficiently "fishy" to permit an inference that it was a pretext because there is evidence in Dr. Gluck and Dr. Kelly's testimony that SCH departed from its normal procedures by failing to investigate the incidents more thoroughly. Moreover, it appears that Dr. McNulty made the decision based on his own subjective belief that plaintiff's conduct was so unacceptable as to amount to a firable offense, without resort to a source of objective standards.

In light of all the relevant facts and circumstances, a reasonable juror could conclude in this case, like in *Eversole*, 804 F. Supp. 2d at 935, that defendant seized on the first plausible pretext for terminating plaintiff following Dr. Amarantos's angry outburst that he wanted "something fucking done" about plaintiff and this lawsuit. *Cf. Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 71 (1st Cir. 2019) ("A third party's retaliatory or discriminatory animus can cause an employer's adverse action where, as a jury might find here, the employer knew that animus motivated the third-party's actions or demands and simply accepted those actions or demands."); *Pettis v. Alexander Graphics, Ltd.*, 52 F. Supp. 2d 950, 954 (S.D. Ind. 1999) (Hamilton, J.) (when conduct leading to plaintiff's dismissal was provoked by another employee who treated him in a discriminatory manner, "a jury could reasonably conclude that [the employer's] asserted reason for [the plaintiff's] termination was a convenient and plausible excuse"). A reasonable factfinder who credited plaintiff's evidence and drew inferences from it favorable to plaintiff could conclude that defendant's decision to terminate plaintiff was "a disingenuous overreaction to justify dismissal of an annoying employee who asserted his rights under the ADA." *Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 200 (7th Cir. 2011); *see Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 442 (7th Cir. 2010) (upholding jury verdict on retaliation claim because jury could reasonably infer that the employer was "fed up" with the plaintiff for "impermissible reasons" because she had engaged in protected activity and was "waiting for an excuse to get rid of her," and the evidence left room for doubt about whether the employer's proffered reason for its decision was sufficiently egregious to warrant "automatic termination"); *see also Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1032-33 (8th Cir. 2013) ("[T]he evidence shows that [the employer] viewed the complaints about [a discriminating employee] as a greater problem than his own behavior . . . [which] permit[ed] an inference that the company simply viewed those who complained as

11

"troublemakers."). A reasonable jury could return a verdict for plaintiff in this case, so defendant's motion for summary judgment is denied.

Plaintiff has moved to strike certain of the facts in defendant's Local Rule 56.1 statement of additional facts, but the Court need not address his arguments because, even considering all of the evidence defendant has adduced, plaintiff's claim still survives defendant's motion for summary judgment. Additionally, in their Local Rule 56.1 responses, the parties raise certain objections to the other's facts, but the Court disregards inadmissible or improper statements as a matter of course, which will have no effect on the ruling in any case, so it need not address these objections individually.

## CONCLUSION

Defendant Swedish Covenant Hospital's motion for summary judgment [119] is denied. Plaintiff's motion to strike [152] is denied as moot. A status hearing is set for March 17, 2021. The parties shall confer regarding the possibility of settlement and the scheduling of next steps, and they shall file a joint status report by March 12, 2021.

**SO ORDERED.**                                         **ENTERED: February 10, 2021**

_____
**HON. JORGE ALONSO**
**United States District Judge**